Below is an opinion of the court.

_David W. Hercher_
DAVID W. HERCHER
U.S. Bankruptcy Judge

UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF OREGON

| | |
|---|---|
| In re | Case No. 19-31883-dwh11 (Lead Case) |
| **15005 NW Cornell LLC**, | |
| Debtor. | MEMORANDUM DECISION ON OBJECTIONS TO BATEMAN SEIDEL CLAIMS AND ADVERSARY PROCEEDINGS 20-03077 AND 20-03079 |
| (Caption continued on page 20.) | NOT FOR PUBLICATION |

## I.      Summary

This memorandum decision combines my rulings, after trial, on two claim objections and two adversary proceedings.

For the reasons that follow, I will allow Bateman Seidel PC's claim 1 against debtor 15005 NW Cornell LLC; determine in adversary proceeding 20-03077 that title to one-half of 15005's property was automatically transferred to Tasha Teherani-Ami, in her capacity as trustee

Page 1 – MEMORANDUM DECISION ON OBJECTIONS TO BATEMAN SEIDEL etc.

of the Sonja Dinihanian GST Trust DTS 1/1/11, before the petition date; and determine in adversary proceeding 20-03079 that 15005 cannot avoid the transfer.

I will file this combined memorandum decision in the lead case and in both actions. The combined captions of the two cases and proceedings begins on page 1 and continues on page 20.

## II. Background

15005 is an Oregon limited liability company of which Dinihanian is manager. 15005 owns an undivided one-half interest in real property the parties call the Farm.

In 2011, a trust was established for Teherani-Ami and Dinihanian's daughter. Teherani-Ami is trustee of that trust. The parties have variously used the terms trust and trustee to refer to Teherani-Ami in her trustee capacity and to the trust for which she is trustee. I will use the term trustee to refer both to her in her trustee capacity and to the trust for which she is trustee.

On March 22, 2016, an Oregon circuit court entered a judgment divorcing Teherani-Ami, then known as Tasha L. Dinihanian, and Dinihanian. Before the divorce, 15005's members were the trustee and Eagle Holdings, LLC, each holding a one-half interest. Eagle's sole member is Dinihanian.

On May 21, 2019, chapter 11 petitions were filed by 15005 initiating main bankruptcy case 19-31883 and by Vahan M. Dinihanian Jr., initiating case 19-31886. The cases are jointly administered, with 15005's case as the lead case.[1]

## III. The claim objections and adversary proceedings

The two proofs of claim at issue were filed by Bateman, a law firm, in 15005's case as claims 1 and 2. The claim objector is the trustee.

---

[1] 19-31883 docket item (DI) 26.

Page 2 – MEMORANDUM DECISION ON OBJECTIONS TO BATEMAN SEIDEL etc.

Adversary proceeding 20-03077 is by the trustee against 15005, Dinihanian, and Eagle. The trustee seeks relief including a declaration that the divorce judgment effected a transfer of an undivided one-half interest in 15005's real property to the trustee before the petition date. 15005's real property is itself an undivided one-half interest in property, called the Farm, that it owns with others as tenants in common. The second action, 20-03079, is by 15005 against the trustee and seeks relief including avoidance as a fraudulent transfer of any prepetition transfer of the property to the trustee.

## IV. Claim objections

### A. Facts

Although the judgment was not admitted in evidence as a standalone exhibit, it is an attachment to another exhibit that was admitted,[2] the judgment's terms were the subject of cross-examination and argument, and the parties appear not to have disputed the relevant language of the judgment.

Paragraph 12 of the judgment addresses the Farm.[3] Paragraph 12.B required Dinihanian (referred to there as husband) to cause 15005 to offer to sell its interest in the Farm to the co-owners. If the co-owners did not timely buy, then Dinihanian was required to cause 15005 to deed to the trustee a 25-percent interest in the Farm, i.e., one-half of 15005's one-half of the Farm, in exchange for the trustee's membership in 15005. In other words, after execution of that transfer, 15005 and the trustee would each be one-quarter owners of the Farm, and Eagle would be 15005's sole member.

---

[2] 19-31883 DI 492-3 Ex. 3 (judgment as Exhibit A to trust deed).
[3] 19-31883 DI 250 Ex. 1 at 17-18.

Page 3 – MEMORANDUM DECISION ON OBJECTIONS TO BATEMAN SEIDEL etc.

Case 20-03077-dwh    Doc 66    Filed 12/13/21

Bateman lawyer Gregory Miner prepared and Dinihanian signed an engagement letter

dated March 26, 2018, addressed to Dinihanian. The engagement letter was not offered or

admitted in evidence, but the parties referred to its terms, and it was attached to a declaration of

Miner.[4] In the engagement letter, the firm agreed to assist Dinihanian to resolve the judgment as

to his interest in the Farm, acknowledging that the judgment required Dinihanian to sell his

interest in the Farm.

In April 2018, Bateman filed in state circuit court a complaint seeking partition of the

Farm among 15005 and its co-owners. The plaintiff is 15005, and the defendants are the other

owners and Teherani-Ami as beneficiary of a trust deed that 15005 granted her to secure her

equalizing money award in the judgment.[5]

The trustee filed objections to Bateman's claims 1[6] and 2.[7] I held hearings on the

objections on November 10 and 22 and December 3, 2021.[8]

### B.    *Claim 1*

Claim 1 is for $182,231.78 as fees for services that Bateman performed representing

15005 as plaintiff in action to partition the Farm. Because the firm's written fee agreement is not

with 15005, but with Dinihanian personally, the trustee argues that 15005 is not liable to the firm

and that the debt to the firm is owed only by Dinihanian.

Bateman disputes this conclusion on two grounds. First, the firm argues that it had an

implied-in-fact contract with 15005. Second, it argues that, even if it had no contract at all with

---

[4] 19-31883 DI 470 Ex. 1.
[5] 19-31883 DI 492 Ex. 4.
[6] 19-31883 DI 455.
[7] 19-31883 DI 456.
[8] 19-31883 DI 484, 497, 501.

Page 4 – MEMORANDUM DECISION ON OBJECTIONS TO BATEMAN SEIDEL etc.

Case 20-03077-dwh    Doc 66    Filed 12/13/21

15005, it is entitled to payment for services that benefited 15005 on a theory of quantum meruit, also referred to as quasi contract.

### 1.    Implied-in-fact contract

An implied-in-fact contract is legally the same as an express contract. Those contract types differ only in that an implied-in-fact contract is inferred, at least in part, from the parties' conduct.[9] The Restatement (Second) of Contracts (1981) gives the example of a person who asks a grocer to send a bag of flour without expressly promising to pay for it. In that scenario, absent contrary evidence, the customer had implicitly agreed to pay for the flour at the current price.[10]

Here, Miner testified without contradiction that (1) after Bateman entered into the written fee agreement with Dinihanian, Miner determined that the end sought by the representation required the partition action, which had to be prosecuted by 15005 as one of the joint tenants of Farm; (2) Dinihanian, as 15005's manager with authority to cause the partition action, reviewed and approved for filing the partition complaint that Miner prepared; and (3) the firm prosecuted the partition action through a third amended complaint, trial, and decision.

By the same logic as the Restatement's flour-purchase example, I agree with Bateman that there was an implied-in-fact agreement by 15005 to pay the going price for the firm's services. That the firm's express contract was with Dinihanian is not inconsistent with there also having been an implied contract between the firm and 15005. This is especially true given Miner's explanation that, when Dinihanian originally the engagement agreement, it was not yet clear that the firm would need to undertake litigation on behalf of 15005. Only later did it become clear that litigation on 15005's behalf to partition the property would be necessary, and

---

[9] Staley v. Taylor, 994 P.2d 1220, 1224 (Or. App. 2000).
[10] Restatement (Second) of Contracts § 4, comment a, illustration 1, cited in Staley, 994 P.2d at 1224.

Page 5 – MEMORANDUM DECISION ON OBJECTIONS TO BATEMAN SEIDEL etc.

then the natural interpretation of events is that the firm was working for 15005 as well as Dinihanian. It might be more difficult to reach this conclusion if Dinihanian, as 15005's manager, had had anything less than total control over 15005. But his control was total,[11] so there was no need for him to consult with anyone else before allowing Bateman to begin working for 15005 in addition to himself.

The trustee suggested in oral argument that Dinihanian's unperformed judgment obligation to cause 15005 to convey a quarter of the Farm to the trustee created a conflict of interest barring Bateman's joint representation of Dinihanian and 15005. But the trustee did not explain how that that scenario gave rise to any duty by the firm to the trustee that would disqualify the firm from any compensation for services to 15005.

### 2. Quantum meruit or quasi contract

As an alternative to its implied-in-fact contract theory, Bateman argued that it is entitled to recover from 15005 on a theory of quantum meruit. Although I have determined that the firm has a claim under an implied-in-fact contract, for completeness I will also address quantum meruit.

Quantum meruit, also known by other names, including "quasi contract," "restitution," and "unjust enrichment," is an equitable doctrine that requires payment despite the absence of a contract. As its various names imply, the purpose of quantum meruit is to prevent injustice by giving a person who has provided goods or services the right to be paid by the recipient or beneficiary, even though the beneficiary never expressly or even implicitly agreed to pay.

In its 1993 decision in *Jaqua v. Nike, Inc.*, the Oregon Court of Appeals held that recovery for quasi contract or quantum meruit required a showing that the plaintiff conferred a

_____
[11] 19-31883 DI 492 Ex. 2.

Page 6 – MEMORANDUM DECISION ON OBJECTIONS TO BATEMAN SEIDEL etc.

benefit on the defendant, the defendant was aware of the benefit, and it would be unjust to allow the defendant to retain the benefit without paying for it. The final element, unjust enrichment, in turn has three elements of its own: the plaintiff reasonably expected to be paid, the defendant should have understood that payment would be expected, and "society's reasonable expectations of security of person and property" demand payment. [12] The parties have argued based on this appellate case law.

But in 2017, the Oregon Supreme Court in *Larisa's Home Care, LLC v. Nichols-Shields* rejected *Jaqua*'s definition of unjust enrichment, describing it as vague, both over- and underinclusive, redundant, and "substantively incorrect."[13] The court held that the present state of the law does not permit a precise definition of unjust enrichment. Instead, a court must reason by analogy, comparing the parties' circumstances to categories that have historically been regarded as examples of unjust enrichment.[14]

The parties disagree whether a plaintiff who has an adequate remedy under a contract (express or implied in fact) can recover on quantum meruit. I agree with the trustee that the answer is no if the person against whom the quantum-meruit claim is asserted is a party to the contract. Each of the cases the trustee cites is limited to that circumstance. Even then, the cited cases permit a plaintiff to plead contract and quantum meruit in the alternative, and the cases bar consideration of quantum meruit only if and after the plaintiff's right to recover on a contract

---

[12] 865 P.2d 442, 445 (Or. App. 1993).
[13] Larisa's Home Care, LLC v. Nichols-Shields, 404 P.3d 912, 921 (Or. 2017).
[14] Id.

(express or implied) has been established by the court or conceded by the defendant before trial.[15]

But the answer is murkier when the putative obligor is not a party to the contract. At least in cases involving construction subcontractors, it appears that the plaintiff must exhaust its contractual remedies before resorting to a quasi-contract claim against a nonparty to the contract.[16] It's hard to know just how far beyond the precise facts of that scenario this principle extends. And given the supreme court's new approach to unjust-enrichment claims, it's difficult to know whether pre-2017 decisions from the court of appeals still have any precedential force.

Because I have found that Bateman has an implied-in-fact contract with 15005, the firm both need not and cannot rely on quantum meruit. I thus won't attempt to resolve whether, absent a contract between the firm and 15005, the firm's contract with Dinihanian would bar its quantum-meruit claim against 15005.

### 3. Dinihanian's obligation to pay partition-action fees

Under paragraph 12.B of the judgment, Dinihanian was required to take certain steps to sell his interest in the Farm. The final sentence of that paragraph is: "If necessary, Husband [Dinihanian] shall initiate at his sole expense a suit to partition the Farm so that he can sell his interest."

---

[15] 19-31883 DI 500; Calhoun v. Bennett, 236 P.3d 745 (Or. App. 2010) (reversed trial court award of damages under contract or quantum meruit; defendant had not disputed existence of plaintiff's contract); Ken Hood Const. Co. v. Pac. Coast Const., Inc., 126 P.3d 1254, 1256 (Or. App. 2006) (remand for reconsideration of trial court's rejection of plaintiff's contract theory; quantum meruit recovery barred "if the parties have a valid contract"); Kashmir Corp. v. Patterson, 602 P.2d 294, 296 (Or. App. 1979) (defendants' answer admitted existence of contract).

[16] Tum-A-Lum Lumber v. Patrick, 770 P.2d 964, 965 (Or. App. 1989).

Page 8 – MEMORANDUM DECISION ON OBJECTIONS TO BATEMAN SEIDEL etc.

Case 20-03077-dwh    Doc 66    Filed 12/13/21

The trustee argues that Dinihanian's obligation to initiate the partition action at his sole expense bars him from pursuing payment for that action not just from her, but also from 15005. In other words, under her view, not only may he not charge her for any part of the cost of the partition action, he also may not charge 15005 or even permit 15005 to pay or to obligate itself to pay. Based on that provision, the trustee argues that it would be unjust to recognize any liability of 15005 to Bateman on any legal theory.

The trustee's argument based on the "at his sole expense" requirement might be relevant to whether Bateman could satisfy the third element of a quantum-meruit claim, unjust enrichment. But I have found that the firm has an implied-in-fact contract claim against 15005, and the trustee has pointed to no authority that justness is an element of an implied-in-fact contract, as opposed to quantum meruit.

### 4. 15005's attorney-fee claims in partition action

Although I have determined that Bateman has a claim against 15005 under an implied-in-fact contract to pay for services performed for 15005, for completeness I will also address the firm's additional argument that 15005 has the right, as asserted in the partition complaint, to recover attorney fees incurred in that action. In general, a right to recover attorney fees accrues to a party, rather than the party's lawyer, even though the fees were incurred by the lawyer. The firm has pointed me to no contrary authority applicable to these facts. I thus reject that argument as a basis to rule for the firm.

### C. *Claim 2*

Although claim 2 was filed in 15005's case, as well as in Dinihanian's, it names as debtor only Dinihanian and does not assert any liability on the part of 15005. And although Bateman's

Page 9 – MEMORANDUM DECISION ON OBJECTIONS TO BATEMAN SEIDEL etc.

Case 20-03077-dwh    Doc 66    Filed 12/13/21

response to both claim objections sought allowance of both claims, it also stated that claim 2 is

owed by Dinihanian and did not assert that claim 2 is also owed by 15005.[17]

I'll thus treat it as conceded by Bateman that claim 2 should not be allowed against

15005. I will disallow claim 2 in 15005's case.

## V.  Adversary proceedings

### A.  Trustee's action, 20-03077

In 20-03077, I held hearings and ruled on the motion for partial summary judgment[18] by

defendants 15005, Dinihanian, and Eagle on September 7, 9, and 13 through 15, 2021, [19] and I

held trial and post-trial argument on September 21, 22, 27, and 29, November 22, and

December 3, 2021.[20]

### 1.  First claim for relief: declaratory judgment that title transferred to trustee before petition date

In her first claim for relief, the trustee seeks a declaratory judgment that the divorce

judgment effected a transfer to the trustee of half of 15005's property. I discussed the merits of

this action extensively when denying summary judgment to the defendants orally on

September 14, 2021.[21] Nothing that was presented at trial changed my analysis.

Under paragraph 22 of the divorce judgment, if Dinihanian failed to make the transfer

voluntarily within 30 days after request, the judgment would become "equivalent to" the transfer

"in accordance with ORCP [Oregon Rule of Civil Procedure] 78."[22] Under ORCP 78 A, a

judgment requiring a party to make a transfer "or other like act within a period therein specified"

---

[17] 19-31883 DI 269 at 2.
[18] 20-03077 DI 37.
[19] 20-03077 DIs 51, 54-57.
[20] 20-03077 DIs  59-62, 64-65.
[21] 20-03077 DI 57.
[22] 19-31883 DI 250 Ex. 1 ¶ 22 at 23.

Page 10 – MEMORANDUM DECISION ON OBJECTIONS TO BATEMAN SEIDEL etc.

Case 20-03077-dwh    Doc 66    Filed 12/13/21

results in the judgment being equivalent to the transfer. Here, the trustee made the demand on March 27, 2019,[23] and he did not comply, so the transfer became effective 30 days later, on April 26, 2019.

Defendants argue that 15005 was not a party to the divorce judgment, so the judgment could not effect a transfer of 15005's property. I disagree for the reasons that I gave in my summary-judgment ruling. Dinihanian was a party to the judgment, and his status as manager gave him absolute control over, and power to act on behalf of, 15005. Although the state court could not directly order 15005 to act, it could and did order him to act on 15005's behalf. And, by virtue of the deemer provision of the judgment and ORCP 78, his failure to act within 30 days of the request had the same effect as if he had acted: it caused the transfer to occur.

The question is not whether 15005 is bound by the judgment or even whether the state court was right to enter a judgment that had an adverse effect on a nonparty. The right questions are whether the state court had the power to command Dinihanian to act on 15005's behalf and whether its command was effective to cause the transfer to occur as if he had acted voluntarily. The answer to both questions is yes.

Defendants argue that the automatic-transfer language in judgment paragraph 22 is superseded by another judgment provision, paragraph 12.D. Under that paragraph, which applies to all the parties' obligations under the judgment, a party's failure to sign any required document after a reasonable opportunity to do so requires the court to sign the document in place of the party, and the document signed by the court is deemed to be the party's conveyance. According to defendants, paragraph 12.D's requirement of an affirmative court order to make a conveyance that should have been made by a party supersedes paragraph 22's automatic transfer.

---

[23] 19-31883 DI 250 Ex. 12.

Page 11 – MEMORANDUM DECISION ON OBJECTIONS TO BATEMAN SEIDEL etc.

I disagree. Paragraph 12.D does not purport to make a judge's order the exclusive way to enforce a party's obligations to sign and deliver documents. And the automatic-transfer language of paragraph 22 expressly applies to all documents, which includes the deed to the trustee required by paragraph 12.B. Paragraph 12.D thus supplements, but does not supersede, paragraph 22. Those two paragraphs serve separate functions. Paragraph 22 makes the transfer to the trustee automatic, and paragraph 12.D enables the transferee of an automatically effective transfer also to have the practical value of receiving an actual, recordable deed.

I agree with the trustee that title to a quarter of the Farm transferred automatically from 15005 to the trustee before the petition date, so I will rule for the trustee on her first claim.

### 2. Second through fifth claims for relief

The complaint in 20-03077 also includes second through fifth claims. The trustee withdrew the second and fifth claims at the summary-judgment hearing.[24] The third and fourth claims state that they are sought in the alternative to the first claim. Because I have ruled for the trustee on the first claim, I will treat the third and fourth claims as withdrawn.

### B. 15005's action, 20-03079

In 20-03077, 15005 seeks relief including avoidance of any transfer of, or any obligation to transfer, an interest in the property to the trustee. It invokes 11 U.S.C. § 544 (a)(3) and (b). Other statutory section references are also to title 11.

---

[24] 20-03077 DI 56.

I held hearings and ruled on the trustee's motion for summary judgment[25] on September 9, 13, and 14, 2021,[26] and I held trial and post-trial argument on September 21, 22, 27, and 29, November 16, and December 3, 2021.[27]

1. **First claim for relief: avoidance under section 544(a)(3)(3)**

In 15005's first claim for relief, it invokes section 544(a)(3) as a ground for avoidance of the transfer to the trustee or any obligation to make an unperformed transfer. That section permits a debtor in possession to avoid an interest in property that would be voidable by a hypothetical good-faith purchaser. Oregon law makes an unrecorded interest in real property void as against a subsequent purchaser in good faith for a valuable consideration without notice of the unrecorded interest and whose conveyance is first filed for record.[28] Section 544(a)(3) treats the debtor in possession as if it were a purchaser without actual notice of an unrecorded interest. But if, as a matter of state law, any good-faith purchaser necessarily would have had constructive notice, the debtor in possession likewise must be treated as having constructive notice, so it cannot avoid the unrecorded interest.

Constructive notice includes both record notice and inquiry notice. Record notice is given if an interest is formally recorded in the real estate records. In the Oregon Court of Appeals' 1999 decision in *Gorzeman v. Thompson*, it explained inquiry notice: "the existence of a claimed interest in real property may be determined through investigations based on facts available to the claimant that would cause a reasonable person to make such inquiry."[29] If the interest is not

---

[25] 20-03079 DI 27.
[26] 20-03079 DIs 40-43.
[27] 20-03079 DIs 45-47, 50, 56-57.
[28] ORS 93.640(1); High v. Davis, 584 P.2d 725 (Or. 1978).
[29] 986 P.2d 29, 34 (Or. App. 1999).

properly recorded, but the real-estate records contain information that would clue a reasonable purchaser in to the existence of the notice, then the purchaser is deemed to have inquiry notice.[30]

In *Gorzeman*, a trust deed appeared to secure an indebtedness of $400, but the actual amount of the debt was about $46,000. The court held that any reasonable purchaser, upon seeing a trust deed securing such a suspiciously small debt, would have inferred that there must be a mistake and would therefore have inquired further. And, having inquired further, the purchaser would read the entire trust deed and discovered the attached promissory note, which reflected the correct, higher amount. Thus, the purchaser had inquiry notice of the correct amount.

The situation here is similar. The divorce judgment, which I have determined in 20-03077 effected a transfer to the trustee, was not independently recorded. But the judgment was attached to a trust deed granted by 15005 to Teherani-Ami to secure the judgment's equalizing $2.25 million money award to her, [31] and that trust deed was recorded.[32] Moreover, the judgment is addressed in the text of the trust deed itself: it is mentioned in a recital,[33] and the obligations secured by the trust deed include those under the Security Documents, a term defined to include the judgment.[34]

Thus: the trust deed gave record notice of the entirety of the judgment; paragraph 12.B of the judgment, combined with the absence of any record of conveyances of the Farm by its co-owners to 15005 gave record notice that Dinihanian became obligated in 2016 to cause 15005 to convey a quarter interest in the Farm to the trustee; paragraph 22 gave record notice that the

---

[30] Id.
[31] 19-31883 DI 250 Ex. 1 at 19 ¶ 13.B.
[32] 19-31883 DI 250 Ex. 2.
[33] 19-31883 DI 250 Ex. 2 at 2 (first and second paragraphs).
[34] 19-31883 DI 250 Ex. 2 at 3 (penultimate paragraph), 4 § 1.1(2), Ex. A.

quarter interest would be conveyed automatically 30 days after the trustee's request; and

paragraph 22 also gave inquiry notice of any actual trustee request that could be discovered by

inquiry—a request that I have found was made on March 27, 2019, resulting in the automatic

transfer on April 26, 2019.

15005 cannot avoid the trustee's interest under section 544(a)(3).

### 2. Second claim for relief: avoidance under section 544(b)(1)

In the second claim for relief, 15005 invokes section 544(b)(1) as a ground for avoidance.

That section permits a debtor in possession to avoid a transfer of an interest in real property that

is voidable outside bankruptcy by an unsecured creditor who holds an allowable claim.

### (a) Existence of unsecured creditor

Section 544(b)(1) requires that an actual, not hypothetical, creditor be able to void the

challenged transfer under applicable nonbankruptcy law.[35] Thus, the initial inquiry required by

that section is whether there exists an actual unsecured creditor who could void the transfer

under nonbankruptcy law. The complaint does not allege the existence of, much less name, an

actual creditor at whose instance the title transfer from 15005 to the trustee could be voided.

At trial, 15005 argued that Bateman is such a creditor by reason of its claim 1. In

response, the trustee argued that claim 1 is not unsecured because it is secured both by

Dinihanian's residence and by an attorney lien in 15005's partition action. Because

section 506(a) defines a bankruptcy secured claim as one secured by property of the estate at

issue, Bateman's security against Dinihanian's home is irrelevant to whether its claim against

15005 is secured.

---

[35] In re DBSI, Inc., 869 F.3d 1004, 1006 (9th Cir. 2017).

15005 does not dispute that an attorney lien in favor of Bateman attaches to its property. But it argues that the lien has little value because it is junior in priority to the trust deed granted by 15005 to Teherani-Ami to secure her $2.25 million equalizing money award and would be eliminated in the foreclosure of that trust deed. Under 15005's theory, the senior trust deed makes the junior attorney lien worthless, or at least worth less than the amount of claim 1, leaving claim 1 partially or entirely unsecured.

I agree with the trustee that Bateman's claim is secured by an attorney lien. Under Oregon Revised Statute (ORS) 87.445(1), the lien technically attaches to the "action[], suit[], or proceeding[]," rather than to its subject matter. But the lien will also attach to the eventual proceeds of the litigation, which will be either the portion of the Farm allocated to it or its share of the proceeds of sale of the Farm.[36]

The value of the lien against the partition action depends on the expected value of the eventual proceeds—here, 15005's entitlement to a quarter of the Farm or its sale proceeds. For purposes of determining whether a claim is secured, section 506(a) requires consideration of the actual, fair-market value of the collateral, rather than what might happen in the event of a senior lienholder's foreclosure. The fair-market, rather than distressed-sale, value of the portion of land that or proceeds that 15005 will receive undisputedly suffices to secure Bateman's attorney lien, as well as Teherani-Ami's senior trust-deed interest. Bateman's claim 1 therefore is fully secured and not an unsecured claim that would satisfy the section 544(b)(1) requirement of an unsecured creditor.

---

[36] Potter v. Schlesser Co., 63 P.3d 1172 (Or. 2003) (attorney lien attaches to the action itself and must be paid "to the extent of the action's value" no matter how the action is resolved).

Page 16 – MEMORANDUM DECISION ON OBJECTIONS TO BATEMAN SEIDEL etc.

15005 has pointed to no other unsecured claims against it, and I have found none. As I addressed above, claim 2 is only allowable against Dinihanian. Claim 3 is Teherani-Ami's fully secured claim for her equalizing money award, secured by a trust deed on 15005's property. The final filed proof of claim, claim 4 by Daniel Lorenz, has been disallowed as not due from 15005.[37] 15005's Schedule E/F shows no claims allowable under section 1111(a) by reason of being scheduled.[38] The schedule lists three claims. The first is of Washington County Assessment & Taxation for property taxes of $1,315.88. Although that amount is listed in the schedule as a priority unsecured claim, Oregon law gives unpaid real-property tax a first-priority lien, making that claim entirely secured.[39] The second listed claim is of Miner (the Bateman lawyer who handled the partition action) for $250,000 for "legal service – partition case." The scheduled Miner claim is thus for the same debt, albeit for $182,231.78, that Bateman asserted in claim 1, which I have determined above to be fully secured by an attorney lien, so claim 1 supersedes the scheduled Miner claim. The third listed claim is of Washington County Dept. of HHS – Code Enforcement, but the scheduled amount is unknown and therefore not a positive amount; no proof of claim was filed for that claim.

### (b) Other elements of section 544(b)(1) avoidance

Although 15005's avoidance action is barred by the absence of an unsecured creditor who could void the transfer to the trustee under nonbankruptcy law, for completeness I will also address the remaining elements of 15005's avoidance claim.

The nonbankruptcy law that 15005 invokes for section 544(b)(1) is the Uniform Fraudulent Transfer Act in Oregon, ORS chapter 95. Under ORS 95.230(1)(b), an unsecured

---

[37] 19-31883 DI 506.
[38] 19-31883 DI 29, part 3.1; DI 49 part 3.1.
[39] ORS 311.405(9)(a).

Page 17 – MEMORANDUM DECISION ON OBJECTIONS TO BATEMAN SEIDEL etc.

creditor can avoid a transfer made for less than reasonably equivalent value if the transferor "was engaged in or about to engage in a business or a transaction for which [its] remaining assets . . . were unreasonably small" or "intended to incur or believed or reasonably should have believed that [it] would incur, debts beyond [its] ability to pay as they become due."

I've already determined that the transfer to the trustee occurred on April 26, 2019. Its only asset remaining after the transfer was its quarter interest in the Farm. The value of that asset remains disputed and unclear. But it can't be deemed unreasonably small in relation to any business or transaction that 15005 was about to engage in. 15005 has never done any business other than owning its interest in the Farm for purposes of development and, since the divorce, for monetization of it (by borrowing against or selling it) to pay Teherani-Ami's equalizing money award. The only transaction in which 15005 was engaged on April 26, 2019, was an attempt to partition the Farm. Its quarter interest in the Farm almost certainly was sufficiently valuable to make that transaction affordable. But because 15005 had no practical way of realizing on the value of its one asset, it reasonably should have expected to be unable to pay any debt that it might incur. And it was clear to 15005 that it would be incurring substantial legal fees during the partition process. 15005 must have known that it had no ability to pay those fees.

The trustee argues that this is not enough, because 15005's inability to pay its legal fees was not caused by the transfer. This is true—15005 would have been just as incapable of paying its debts to Bateman had the transfer never happened. But contrary to the trustee's arguments, I can find nothing in the UFTA that requires a creditor-plaintiff to prove that a transfer caused it to become unable to pay its debts; the law requires only that the transfer occurred when debtor's inability to pay its debts was obviously about to begin.

### (c) Affirmative defenses

Even though unnecessary, for completeness I will also address the trustee's affirmative defenses that survived summary judgment, the third through sixth and eighth defenses.

The third defense is that Dinihanian lacked authority to cause 15005 to bring the avoidance complaint. The complaint was authorized for the same reasons that I earlier denied the trustee's motion to dismiss 15005's main case because the trustee believed that Dinihanian lacked authority to file the petition on behalf of 15005.[40]

The fourth through sixth defenses are that the action is barred by estopped, judicial estoppel, and claim preclusion, in support of which the trustee relies on positions taken or admission made by 15005 in the partition action. But the trustee has not identified positions taken or admissions made by 15005 in the partition action that are inconsistent with the positions taken in 15005's action.

The eighth defense is that 15005 and Dinihanian initiated 15005's action in bad faith and for purpose of oppression—specifically, to force Teherani-Ami to resign as trustee of the trust. The trustee offered no legal authority that an avoidance defendant may defend based only on the plaintiff's oppression of the debtor in the corporate sense or the plaintiff's desire to accomplish a goal in addition to avoidance.

I will rule against 15005 on the first and second claims for relief, which seek avoidance under sections 544(a)(3) and (b)(1). The second claim also requests avoidance of 15005's obligation to transfer title. That claim is mooted by my determination in the trustee's action that title had transferred before the petition date.

---

[40] 19-31883 DIs 139, 305, 306.

The third claim seeks declaratory judgment that, under ORS 93.020(1), the judgment did not effect a transfer of the property to the trustee because it was not signed by Dinihanian in his capacity as manager with formalities required by law. That statute permits requires formalities only if the transfer is not "by operation of law." My determination in the trustee's action that title transferred to the trustee automatically, without an actual deed having been executed by 15005, is another way of saying that title transferred by operation of law. I will therefore also rule against 15005 on its third claim for relief.

## VI. Orders and judgment

Counsel for Bateman should circulate and lodge orders on the claim objections, and counsel for the trustee should circulate and lodge judgments in the adversary proceedings.

* * *

(Continuation of caption from page 1)

| | |
|---|---|
| In re | |
| **Vahan M. Dinihanian Jr.**, | Case No. 19-31886-dwh11 |
| Debtor. | |
| **Tasha Teherani-Ami, in her capacity as the trustee of the Sonja Dinihanian GST Trust DTS 1/1/11**, | |
| Plaintiff | |
| v. | Adversary Proceeding No. 20-03077-dwh |
| **Vahan Dinihanian, Jr., 15005 NW Cornell LLC;** and **Eagle Holdings LLC**, | |
| Defendants. | |
| **15005 NW Cornell LLC, an Oregon limited liability corporation**, | |

Page 20 – MEMORANDUM DECISION ON OBJECTIONS TO BATEMAN SEIDEL etc.

|  |  |
|---|---|
| Plaintiff, | |
| v. | Adversary Proceeding No. 20-03079-dwh |
| **Tasha Teherani-Ami, in her capacity as the trustee of the Sonja Dinihanian Trust DTS 01/01/11**, | |
| Defendant. | |

# # #

Page 21 – MEMORANDUM DECISION ON OBJECTIONS TO BATEMAN SEIDEL etc.

Case 20-03077-dwh    Doc 66    Filed 12/13/21